207 A.2d 12 (1964)
Petition of FRANKLIN BUILDERS, INC., a Delaware Corporation.
ALAN CONSTRUCTION COMPANY, a corporation of the State of Delaware, Petitioner,
v.
Tyson F. SARTIN, B. Frank Collins and Gene Derrickson, constituting the Zoning Board of Adjustment, New Castle County, William Matthews, the Sign Inspector of New Castle County, and Charles A. Weatherby, the Building Inspector of New Castle County, Respondents.
Superior Court of Delaware, New Castle.
October 8, 1964.
Daniel L. Herrmann and William D. Bailey, Jr., of Herrmann, Bayard, Brill & Russell, Wilmington, for petitioner, Franklin Builders, Inc. (hereinafter referred to as Franklin).
William F. Lynch, II, of Morris, James, Hitchens & Williams, Wilmington, for petitioner, Alan Const. Co. (hereinafter referred to as Alan).
Clarence W. Taylor, Chief Atty. for Levy Court of New Castle County and Norman N. Aerenson, Wilmington, an attorney for Levy Court of New Castle County, for New Castle County Board of Adjustment (hereinafter referred to as Board).
William Prickett, Jr., Wilmington, filed a brief for and argued case on behalf of North Millcreek Ass'n in opposition to application of Alan Const. Co.
*13 LYNCH, Judge.
The questions raised in these two cases are substantially the same  hence the Court proposes to dispose of the two cases in one opinion, after first separately stating the pertinent facts of each case. Because of the background of the cases the facts will be stated rather fully, primarily to show the questions raised are not really as substantial as argued.

The Facts in No. 3057 Civil Action, 1964 Petition of Franklin Builders, Inc.
Petitioner, Franklin Builders, Inc. (referred to hereafter as "Franklin"), is a home builder. It owned and now owns a subdivision, located in Brandywine Hundred, New Castle County, known as "Northridge". It is located in an area some distance remote from the location of the sign which is in question and under attack. The subdivision "Northridge" does not front on a main or arterial highway; it is located in a rural area of the county, some considerable distance from any such a highway. Its lands and the land on which it erected or caused to be erected the sign which is under attack are classified on the County Plan as R-1-C, and all such lands are bound by regulations such as are to be found in the New Castle County Building Code. Article IV, Section 1 of such Zoning Code has this language:
"In an R-1 District, no building or premises shall be used and no building shall be erected or altered which is arranged, intended or designed to be used except for one or more of the following uses * * *."
This Zoning Code has been in effect since 1954.
Franklin erected its sign[1] in September of 1960  without first seeking any permit of any kind from any authorized official of New Castle County to do so. The land on which the sign is erected is the subject *14 of a contract of license agreement between Franklin and the owner of the land on which the sign has been erected.
The sign in essence reads 

"NORTHRIDGE

"Franklin Builders, Inc. NEW MODEL HOMES"
A photo of said sign appears below.

The sign was erected on a lot, located at the intersection of Harvey Road and Garfield Avenue, in Claymont Heights. The sign was placed on a pole of the type used by the telephone and power companies; this pole stands 28 feet 6 inches in height. The sign is illuminated at night by spot lights, which appear on the photograph.
Because of objections to the sign from neighbors living near the sign, Franklin filed an application about a month after the sign was erected with the Zoning Board of Adjustment, referred to hereafter as "the Board". It asked the Board for "a temporary permit" for
"A directional sign to the real estate development known as NORTHRIDGE"
The application recites:
"This sign was erected with the permission of the owners of the land occupied by the sign but in as much as it is not clear as to whether a sign is permitted by the Zoning Code * * * a temporary permit is requested for a period of three years for this sign, to avoid any possible violation that may exist or be implied to exist under the Code."
After giving notice the Board held a hearing on this application. Franklin contended at the hearing, in substance, that the sign was directional and so not within the scope and meaning of the Zoning Code.
On October 18, 1960, the Board determined that the sign was "improperly placed" *15 and ordered "that this sign must be removed within ten days".
On October 28, 1960 Franklin, through its then attorney, John Van Brunt, Esquire, filed a Petition for Rehearing, but otherwise Franklin did nothing pursuant to the order of removal.
A hearing was held on the petition for rehearing on November 10, 1960, at which Franklin continued to assert the sign was directional in nature; it also contended there was a constitutional question posed because the Code permits signs advertising sale of homes if such signs are located on the premises where the homes were built. Franklin noted its houses were not built on the land where the sign in question was located, but contended the sign was placed where it was so as to advertise sale of its homes in its subdivision, only because its subdivision did not front on a main or arterial highway, where the sign could be seen by more of the public passing in their cars.
Franklin also argued that the sign did not come within the standards of "public health, safety and morals", which it insisted, are the basic "standards of zoning", and the Board was dealing with questions of aesthetics rather than considerations of "zoning".
Mr. Weiner, President of Franklin, testified at the hearing before the Board, in part, as follows:
"We realize that the sign is a large one, and in the sense that it was directional primarily rather than a billboard * * *."
Later, in answer to a direct question by the Chairman of the Board, Mr. Weiner conceded installation of this sign is "a commercial use [of the land] though in an R-1-C zone".
Franklin's attorney likewise conceded that the sign 
"* * * is a commercial use, but [contended] it is [also] a directional use."
Counsel further contended that "the Zoning Code makes no provision for this type of sign"; that the Zoning Code only relates to billboards and that Franklin's sign was not "an advertising sign" or "a billboard".
The Board rendered no decision on the petition for rehearing, possibly because of several changes in the make-up of the personnel of the Board after the hearing was held on the petition for rehearing.
The County Sign Inspector directed the sign be removed by February 14, 1964.
Franklin then obtained new counsel, who addressed a letter to the Chairman of the Board, asking the order of the County Sign Inspector be rescinded until the Board "has taken final action" on the petition for rehearing; it also asked an opportunity be given to Franklin to appeal, if the Board action was unfavorable.
This new counsel submitted another petition for rehearing and Franklin asked for further rehearing so as to present its views concerning the sign.
The Board fixed March 12, 1964 for the hearing. Many persons attended and testified as to the intensity of the illumination of the sign and how such illumination affects homes located in the vicinity of and/or adjacent to the sign. Their statements and testimony show the sign in question presented problems for persons living in homes located close to the sign, especially in the use of their driveways, because "they are blinded by these lights" making it hazardous to come out of their driveways at night. Other witnesses stated and testified they could not use their living rooms because of the intensity of the spot lights located about the sign. It would appear that spot lights are used in connection with the sign so as to emphasize its appeal, but just how these aided in directional guides is less than clear.
*16 Franklin's counsel at the hearing ultimately took the forthright stand that the Board had no jurisdiction to direct the removal of the sign, since he contended it is a directional sign.
Continuing in his argument, counsel contended before the Board:
"We find the law to be * * *, if we are correct in saying this is a directional sign, that this is a matter for the State Highway Department[2], because under the law, the State Highway Department has control of directional signs, and, under the law, until the State Highway Department does something about this sign, it is a sign that is properly there."
He argued further:
"It [the sign] does not violate any valid zoning regulation because it is directional.
"It [the sign] does not violate any valid statute that falls within the power and jurisdiction of this Board."
Counsel concluded by asking the Board:
"* * * to vacate the order which was entered back in 1960 for the reason that [the Board had no] jurisdiction or power to control this sign, * * *."
The Chairman of the Board, in the course of argument, asked Franklin's counsel if he would agree that it is an advertising sign. Counsel would not agree, but did comment:
"This is a question of fact, perhaps; men can differ on this, I am sure."
The Board rendered its determination April 8, 1964. The Court believes that it should make some extended reference to the language of this determination so as to illustrate the simplicity of the problems really presented.
After stating the substance of the position taken by Franklin's counsel, the Board said, inter alia:
"Applicant's counsel also submitted that the subject sign violates neither the New Castle County Zoning Code nor any valid Delaware Statute. * *. Counsel [also] went on to state that, `The constitutional protection against the taking of property without compensation and due process of law are violated by this Statute.' Counsel summed up his position by stating that the maintenance of the sign in question, `violates no valid Delaware Statute or New Castle County Zoning Ordinance, and its continued use, guiding travelers to Northridge, should not be interfered with by the Board of Adjustment'.

*17 "The Board, in determining its jurisdiction to act in an expeditious manner on this application, must be guided primarily by the existing zoning regulations in effect in New Castle County. The Board, through policy, precedent and fact, established and affirmed over the years has taken the position that the New Castle County Zoning Code is `inclusive' in nature and, therefore, permits only those uses specifically named under a particular zoning category; and, in doubtful cases, the Board finds that the property owner must assume the burden of showing that the use to which he proposes to put his premises is an included or permitted use. From this position the Board must conclude that the use to which the applicant has put his premises, which is presently zoned R-1-C (one-family residential), is not a permitted use under Article IV, Section 1 of the New Castle County Zoning Code. The Board, in reviewing this particular section of the Zoning Code, finds that the use of the subject sign as presently existing on the property under consideration, does not fall within the meaning and intent of this particular section of the Zoning Code. Under Paragraph (14), Section 1, of Article IV, the Zoning Code specifically permits a `Real Estate sign advertising the sale or rental of only the premises on which it is located and with an area of not over six (6) square feet in area conforms with the setback regulations of the State Highway Department; * * *.' Inasmuch as the sign as erected on the subject property does not offer it for sale or rent, the Board must conclude that this particular section of the Zoning Code does not permit the erection nor continued maintenance of the subject sign.
"The Board, in reviewing the subject of whether or not this sign is `directional' in nature, must refer to Article II of the County Zoning Code which defines a sign as, `Any structure either on its own supports or attached to another structure, a building, or a tree, or any notice painted on the wall of a building, which shall display any letter, work, model, device, or representation used as an announcement, direction, or advertisement.' From this stated definition of a sign, and by the fact that the New Castle County Zoning Code is `inclusive' in fact, the Board concludes that the subject sign is a direct violation of the permitted uses under Section 1, Article IV of the County Zoning Code. (Emphasis by the Board)
"In arriving at these stated conclusions, the Board is of opinion that the New Castle County Zoning Code is constitutional[3] and valid, and the Board supports the propositions that (a) the burden of proving the ordinance to be unreasonable, arbitrary, discriminatory or confiscatory is upon the person attacking the ordinance, (b) that where the question is debatable, the ordinance will be upheld, and (c) that the courts will not substitute their judgment for that of the legislative body unless the unreasonableness of the ordinance is clear.
"The Board, in reviewing the subject of whether or not the Delaware State Highway Department has jurisdiction to order the removal of this subject sign, refers to the State Law[4] regarding outdoor advertising. The Board *18 notes that it does not have authority under this particular State Law to permit any outdoor advertising which is prohibited by this State Law, and notes further that neither does the State Highway Department have jurisdiction `to permit any outdoor advertising which is prohibited by any other law or by any board, officer or public agency in the lawful exercise of its or their powers.' From this, the Board concludes that the State Highway Department does not have jurisdiction to permit the continued maintenance of this subject sign as in the Board's opinion, the sign violates the provisions as set forth within the New Castle County Zoning Code.
"The Board from the conclusions as stated herein takes action to deny this application to permit the continued maintenance of the subject sign and herein directs the County Building Inspectors Office to see to the removal of the subject sign within twenty (20) days of the date of the filing of this decision."
Following the Board's determination, Franklin filed its petition for certiorari under the statute and since there was no objection asserted by counsel for the Zoning Board of Adjustment the Court issued a restraining order so as to permit full consideration of the questions Franklin raised before that Board.

Facts in Civil Action No. 3080, 1964 Alan Construction Company v. Sartin et al.
Alan Construction Company (referred to hereafter as "Alan", is also a homebuilder; it owns a subdivision in New Castle County known as "Highland West" which is likewise zoned R-1-C. This subdivision is also located some distance from the place where its advertising sign is located.
A photograph of the sign appears below.

The Alan litigation shows that on October 17, 1963 it made application to the Board for 
"a temporary permit to maintain a bill-board type sign, advertising the housing *19 development known as `Highland West'."
The sign[5] was placed on a lot, located at the intersection of Newport Gap Pike and Hercules (Mill Creek) Road. The sign is located on land zoned R-1-C, which land is not owned by the applicant, but is also subject to a license agreement.
The sign is located about one half mile from the subdivision of "Highland West"  which it advertises.
Alan's application for the permit, dated October 17, 1963, recited, among other matters, that:
"Existing sign is in violation of R-1-C zoning and hence does not conform to regulations of the Code."
Alan conceded at the hearing that the sign was erected without a permit; that an application had been submitted, but it was, in effect, rejected. Nonetheless, Alan proceeded with erection of the sign.
Alan's counsel stated at the hearing the sign advertised "the development known as `Highland West'". He suggested to the Board that it permit the sign to stand for 6 months noting:
"Under the Code provisions under which the permit is sought [it] is discretionary with the Board as the Board `has the authority to grant temporary and conditional permits of limited duration for non-conforming uses'."
Counsel stated to the Board:
"This is a non-conforming use, in a general sense in which that [term] is used. I think the technical and usually accepted understanding of a non-conforming use is a use that existed prior to zoning which doesn't conform to the subsequent zoning classification."
But he then contended:
"The so-called `generic sense [of the term which] simply means a use that doesn't conform with zoning'[6] has to be given to this particular Code provision, otherwise it would be meaningless to have included this in the Code."
He further contended:
"* * *. There is, to my knowledge, no requirement that a permit be granted anybody who has a non-conforming use. Non-conforming uses by the Code are permitted to stay, * *."
Counsel further urged the fact that the sign which he stated "is a fairly expensive sign" had been erected, presented "a meritorious reason for granting this application"; he likewise observed he was unable to understand why Alan's application had been "rejected".
*20 It was brought out at the hearing Alan had been warned that its sign (then in course of erection) violated the Code but Alan "chose to proceed" with its erection. An enforcement official of the Board also advised Alan that its sign was illegal, but to no avail, as it proceeded to erect the sign.
Criminal sanctions were ultimately invoked by the Board under the Code. Only then did Alan seek a hearing for a permit. Many persons appeared in opposition to Alan's application.
The Board's "Notice of Action", following the hearing, stated inter alia:
"* * *. The Board, in this decision will treat only the advertising sign as being the subject of this particular application.
"The Board is cognizant of the plight of the builder, in that a substantial investment is involved in the development of the subdivision which is advertised on the subject site. Nonetheless, the Board takes an exceedingly dim view of the Builder's action in erecting this particular sign without permission * * *.
"The Board is of the opinion that the granting of a six (6) months temporary permit[6a] would enable the builder to properly advertise his development in its initial stages of construction and would therefore help to protect the investment of the builder to a limited degree. The Board is also of the opinion that the granting of the six (6) months temporary permit would not be a deterrent to the planning and future development of this general area. The granting of this temporary permit would not constitute a permanent mark on this general area, as the termination of the six (6) months time limit would result in the removal of this particular structure.
"The Board, in arriving at this conclusion, feels that it is being just with both the residents of the general area and the builder. The Board therefore takes action to grant applicant a six (6) months temporary permit to permit the subject sign to remain on the subject premises. * * *.
"The time period for this permit commences with the date of filing this decision in the office of the Board."
On May 4, 1964 counsel for Alan submitted a second application "for an extension of the temporary permit heretofore granted. * * *." Among the reasons it tendered as grounds for granting the permit, was the pendency of the Franklin litigation.
The Board held a hearing on May 25, 1964. Alan's counsel was present, as was an attorney for objectors.
Alan's attorney again emphasized the "hardship" phase, yet conceded the sign was erected for advertising purposes. He then stated:
"* * * I think it would not be stating it correctly if I said this was purely a direction sign, because obviously Mr. Marta would not have put that size sign up had he felt it was purely directional. So that it has got to be a combination direction and a combination advertising [sign]. * *."
The question of constitutionality of the law was also presented, it being argued the law was discriminatory as between builders with frontage on heavily traveled highways and those builders not having frontage on such highways. Alan's contentions were the same in substance as those urged by counsel for Franklin.
It was stated by the principal stockholder and principal officer of Alan:

*21 "* * *. It's just the benefit of having a sign on a main road. That's all we are looking for."
The objectors showed the State Highway Department had erected a "directional" sign at a road known as the Loveville Road intersecting at Newport Gap Pike and pointing the direction to Alan's subdivision.
Alan's attorney raised the question, as did the objectors' attorney, as to the power of the Board to consider and determine the issue of law presented by the constitutional question advanced by Alan.
The Board's determination of Alan's application was made on May 28, 1964. The Court believes some extended reference should be made to the Board's holding so that the questions for the Court's ultimate determination will clearly appear:
"NOTICE OF ACTION
"Applicant seeks extension of temporary permit for a free standing sign to remain on property situated at the northwesterly corner of Newport and Gap Turnpike and Mill Creed Road, Mill Creek Hundred. Sub. Sec. 65, R-1-C zoning.
"The extension of the temporary permit was based on the following reasons:
"1. Removal of the sign will pose a hardship on the builder.
"2. The subject sign only puts the builder on an equal basis with other builders in the general area who have development lands on main highways and, therefore, can erect an advertisement sign with the requirements.
"3. A new sign law is likely to be enacted in the near future.
"4. The sign should not be removed until the Superior Court in and for New Castle County renders a decision on a Zoning Board of Adjustment case, now pending before it, concerning a similar situation.
"The Board, in reviewing the facts * * *, finds the following:
"1. The builder did not secure a construction permit prior to the erection of the subject sign.
"2. The builder chose to erect the subject sign without a construction permit.
"3. The sign was posted by the County Building Inspector's Office as a violation of the Zoning Code.
"4. The builder applied to the Board for a temporary permit for the subject sign only after he was scheduled to appear before the Court of Common Pleas in and for New Castle County to answer to the Building Inspector's action.
"The Board, in its original decision in this matter, was of the opinion that the granting of a six (6) months temporary permit would enable the applicant to properly advertise his development in its initial stages of construction and would, therefore, help to protect investment of the builder to a limited degree. The Board also stated that the granting of the six (6) months temporary permit would not be a deterrent to the planning and future development of this general area, as the termination of the six (6) months time limit would result in the removal of the subject sign.
"The Board, at this time, cannot find grounds to extend the temporary permit beyond the time limit originally stated and, therefore, takes action to deny this subject application. As the Board's jurisdiction to grant or deny temporary permits is discretionary, the *22 Board is of the opinion that its action, at this time, is merely a reaffirmation of its decision of December 5, 1963 in this captioned matter. The Board is of the opinion that its December 5, 1963 decision gave the applicant an opportunity to advertise the development in its early stages of construction and the Board is of the opinion that this has been accomplished.
"Testimony presented on this particular application by applicant's counsel, brought forth the opinion that the County Zoning Ordinance `which created this situation is unenforceable as invalid and unconstitutional'. Applicant's counsel also stated that in his opinion this application represents, `A clear case of discrimination as the applicant cannot advertise in competition with his more favored neighbor'. Counsel continued by stating, in a memorandum of law submitted to the Board, that, `The law is invalid and the applicant should be permitted to maintain the sign in question until the adoption of a new comprehensive non-discriminatory sign law for New Castle County is enacted'. The Board is of the opinion that it is charged with the responsibility of enforcing and interpreting the County Zoning Code as it is presently written and that attacks upon the Zoning Code should be made by appropriate legal action.
"The Board herein directs the County Building Inspector's Office to see to the removal of the subject sign by June 5, 1964."

The Law
Article II, § 25, of the Delaware Constitution, as amended, 47 Del.Laws, Ch. 323 and 48 Del.Laws, Ch. 79, Del.C.Ann., now and at the times mentioned herein, provided:
"Section 25. The General Assembly may enact laws under which * * * the County of New Castle may adopt zoning ordinances, laws or rules limiting and restricting * * * the nature and extent of their use, as well as the use to be made of land in such districts for other than agricultural purposes; and the exercise of such authority shall be deemed to be within the police power of the State." (Emphasis supplied.)
The General Assembly,[7] acting thereunder, enacted legislation, 9 Del.C., Chap. 26, authorizing Levy Court of New Castle County to regulate 
"* * * the uses of land * * * in any portion * * * of New Castle County which lie outside of incorporated municipalities." (Emphasis supplied.)
Thus, it is readily apparent that the Constitution and Statutes of this State have empowered New Castle County with power to control the "use" that can be made of land which is subject to zoning regulations.
New Castle County Levy Court, pursuant to the grant of legislative power, zoned land in the rural areas of that county; and adopted a Zoning Code under date of September 28, 1954, regulating, among other things, "the uses of land" in the several districts.
Our specific problem in these cases is to see to what extent the law permits the "use" of lands located in New Castle for the erection or installation of signs or other means of identification of the lands located therein. Thus, a review of the entire Zoning Code seems desirable to fully comprehend our problem.
Among permitted uses of lands zoned "R-1" are professional offices; a small professional announcement sign not over *23 one square foot in area (Article IV, § 1(7) is authorized; and customary home occupations, such as millinery or dressmaking (Article IV, § 1(8); "An announcement sign not over one square foot in area" is permitted in connection with such "use"; but the sign must be "attached to the main wall of the dwelling" and "no such sign shall be illuminated".
Article IV, § 1(14) authorizes a 
"Real estate sign advertising the sale or rental of only the premises on which it is located is permitted and with an area of not over six (6) square feet on lots less than fifteen thousand (15,000) square feet in area and not over fifteen (15) square feet on larger lots, provided any such sign of more than six (6) square feet in area conforms with the set back regulations of the State Highway Department; * * *."
The same cited subsection of Article IV also authorizes a
"* * * bulletin board [to be set up] in connection with a building for one of the purposes specified in paragraphs (3)[8] and (4)[9] of this section."
Article IV, § 1(2) permits "the taking of non-transient boarders or roomers by a family resident on the premises, but the cited code provision stated "there is [to be] no display or advertising on the premises in connection with such use * * *."
The Zoning Code, as a whole, refers to "signs" in several places.
For instance, the word "Sign" is defined in Article II of the Zoning Code:
"Sign: Any structure either on its own supports or attached to another structure, a building, or a tree, or any notice painted on the wall of a building, which shall display any letter, word, model, device, or representation used as an announcement, direction or advertisement."
The term "Billboard" is also defined in Article II of the Zoning Code:
"Billboard: A sign, other than one indicating a business conducted on the premises, upon which is painted, posted, or lettered by any means, advertising matter of any character, or which is designed for such purposes."
Article IV, § 2(17), which deals with R-2 districts, permits radio or television broadcasting towers in such R-2 districts, and impliedly permits an "identification sign", provided it is not "illuminated".
Article IV, § 2(20), still dealing with "R-2 Districts", permits "announcement or identification" signs "not over fifty (50) square feet in area applying to the identification of premises or buildings or to activities upon such premises or within such buildings", which are used for "commercial greenhouses", or "the raising of mink or fixes" or "Hospitals or sanitariums" or "hospitals for contagious diseases, correctional institutions," or "hospitals treating epileptic, drug, or alcoholic patients, and asylums for the mentally diseased", or "aviation fields" or "Trailer parks" or as a "cemetery" or as an "amusement park, race track, fair grounds, rodeo, livestock auction, or similar establishments," or as "summer or vacation camps for children or adults", or as "riding clubs, ranches or riding stables" or as "club house or fraternal lodge" or as a "Kennel or veterinary hospital". The same section provides:
"* * * Such sign shall be located not less than fifteen (15) feet from a street line and illumination shall be limited to a non-flashing white light."
Article IV, § 2(21) authorizes as an "accessory use"  "a roadside stand for the sale of agricultural products raised on the premises, or on another farm in New Castle *24 County, * * *" and the cited section further authorizes "an announcement or identification sign as is permitted under paragraph (20)" heretofore discussed.
Section 3 of Article IV of the Zoning Code refers to land uses in "R-3 Districts", which pertain to "Garden apartments and Group Housing Residential". No reference to use of signs is to be found in such section, except that paragraph (1) authorizes "any use permitted in an "R-1 District" and this would permit such use of signs as are to be found in R-1 Districts".
Article IV, § 4(11)  referring to "R-4 Districts" permits a 
"Professional or announcement sign not over two square feet in area if attached to the main wall of a residential building, except that in case of a tourist home such sign may be located at any point behind the required building set back line for the premises; announcement or identification sign not over twelve (12) square feet in area applying only to the identification of premises or buildings, or to activities upon such premises or within such buildings, permitted under paragraph (6)[10] (7)[11] and (8)[12] of this Section."
Article V of the Zoning Code deals with "R-C (Residential-Commercial Districts)" and it authorizes "any use permitted in an R-2 District  carrying with such grant of authority, permission to use such signs as are approved for use in such R-2 Districts. No other grant of authority to use signs on lands zoned R-C is set forth in the Zoning Code.
Article VI, § 1 of the Zoning Code sets out "Use Regulations for Commercial Districts". Section 1 of this article deals with "C-1 Districts (Neighborhood Shopping)" areas and the uses of the lands so zoned are explicitly stated. Paragraph (9) of such section reads:
"(9) Real estate sign indicating the property on which it is located is for sale or for rent, not over twenty-five (25) square feet in area, and subject to the setback regulations of the State Highway Department; a sign advertising a use conducted on the premises with an area in square feet not exceeding one and one-half (1½) times the length of the wall of the building to which it is attached, except that this shall not prevent a customary free-standing identification sign not more than twenty (20) square feet in area accessory to an automobile service station but not more than one such sign for each street on the which the lot fronts. No flashing sign shall be permitted."
Lands zoned C-1 may be used for billboards, providing they comply with paragraph (10) of such section, which reads:
"(10) A billboard not to exceed the standard 24-sheet or three hundred (300) square feet in area, provided that not over two such billboards are erected in a single C-1 District, they are erected on their own foundation, and they comply with the setback regulations of the State Highway Department."
Attention is directed to the concluding but unnumbered paragraph of such section. This reads:
"All other uses hereinbefore permitted in Residence or Residence-Commercial Districts are excluded from C-1 Districts and such exclusion is hereby declared to be for the purpose of reserving such areas for local shopping centers to serve residential neighborhoods, *25 and with the intent of placing within such districts on the Zoning Map only such limited areas as it is believed will be needed for such purposes."
Article VI, § 2 of the Zoning Code sets out the "use" regulations for "C-2 Districts (Roadside Business)". Paragraph (1) authorizes "Any use permitted in an R-4 District". This would include such grant of authority as to use of signs as is to be found in the use regulations relating to R-4 Districts. Paragraph (2) authorizes "any use permitted in a C-1 District, except that a billboard shall be subject to the provisions of paragraph (16) of this Section." That paragraph provides:
"(16) A billboard, to be set back not less than forty (40) feet from any street line and not to exceed the standard 24-sheet or three hundred (300) square feet in area."
Article VI, § 2 of the Zoning Code sets out the "use" regulations for "C-3 Districts (General Business)".
Paragraph (1) authorizes "Any use permitted in a C-2 District except a drive-in theatre". Paragraph (8) provides:
"(8) A billboard not to exceed the standard 24-sheet or three hundred (300) square feet in area subject only to the setback regulations of the State Highway Department."
Article VII of the Zoning Code relates generally to "Use Regulations for Manufacturing Districts".
§ 1 relates to "Uses permitted in M-1 Districts (Light Manufacturing)". Paragraph (1) authorizes "any non-residential use permitted in C-3 District".
Paragraph 8 thereof provides:
"(8) Real estate sign indicating the property on which it is located is for sale or for rent, not over one hundred (100) square feet in area."
Paragraph (9) purports to authorize certain uses "except within those M-1 Districts located along the inland side of and adjoining Governor Printz Boulevard as presently laid out". Continuing, the paragraph reads:
"* * *. (Such districts, due to the heavy trucking traffic on the boulevard and the nearness of the main line of the Pennsylvania Railroad, have become desirable only for some form of commercial or light industrial development, but have already been partially developed for residential uses which would be detrimentally affected by the following uses, which are therefore prohibited therein.)"
Among the prohibited uses in such district are  subparagraph (g), which reads:
"(g) A billboard, not to exceed six hundred (600) square feet in area, provided it complies with the setback regulations of the State Highway Department."
Whether such billboards can be erected in the proscribed area is less than clear.
Section 2 of Article VII of the Zoning Code prescribes the permitted uses of land located in and zoned General Industrial Districts. There is no explicit grant of authority for use of lands, so zoned, for purposes of signs or billboards, except as one of the permitted uses as land zoned Light Manufacturing, but then too there is no proscription against signs or billboards on lands so zoned.
Section 3 of Article VII of the Zoning Code prescribes the permitted uses of lands located in and zoned Heavy Industry Districts. Again there is no explicit grant of authority for use of lands so zoned for purposes of signs or billboards.
Bave et al. v. S. & S. Builders, Inc., 36 Del.Ch. 543, 134 A.2d 709 (Ct.Ch., 1957) is determinative of the arguments advanced in this case so far as they involve the question of whether the Zoning Ordinance can *26 or cannot control the location and size of signs on lands where it is in violation of the stated "use" of the lands, according to the Ordinance and the Plan.
The above cited case involved a suit to enjoin a land developer from building a road across one of defendant's own lots, classified R-1 residential, so as to service an area for development of other lands belonging to the defendant. Plaintiff contended that the restrictions in the County Zoning Ordinance precluded defendant's "use" of its land for road building purposes, without first getting the lot reclassified by the Zoning Commission under the Zoning Ordinance.
In granting judgment to plaintiff, the Chancellor, after reviewing the Statute and Ordinance to ascertain the purposes herein set forth, ruled 36 Del.Ch. 545, 134 A.2d 710:
"It can be seen that the Levy Court is granted the power by statute to regulate the use of land in the county for certain broadly defined purposes. The enumeration of purposes, of course, justifies the implication that the use of land for other purposes is not subject to the control of the Levy Court. * * *." (Emphasis supplied.)
The Chancellor said later, 36 Del.Ch. 546, 134 A.2d 711:
"Article III, § 3 of the Zoning Code provides that premises (which include a vacant lot) which in effect have been zoned for a particular purpose shall not be used for any purpose other than a use permitted therefor by the Code. Clearly the use of the defendant's lot for a public road is not a permitted use under the existing zoning classification of defendant's lot. Thus, it cannot be so used without approval of the zoning authorities unless the Code does not apply to public road uses."
It is true that the cited case is the reverse of the question presented here, but the decision does support the proposition that the Levy Court has power to prescribe the "use" that may be made of land under the Zoning Code.
This Court has already ruled in In the Matter of The Petition of Shell Oil Company, Del.Super., 203 A.2d 845 (decided September 29, 1964), that the Zoning Board of Adjustment is without power to grant "Special Permits" and the discussion found in that case is equally applicable here. Hence, the Court holds that the Board should not have granted to Alan Construction Company the temporary "permit" to erect and maintain the sign advertising the subdivision known as Highland West. (supra, page 20)
I can find no substance or merit in the constitutional questions raised by the litigants in these cases. Whatever might have been the comprehension of the extent and scope of the "police power" as it was understood when Mayor and Council of Wilmington v. Turk, 14 Del.Ch. 392, 129 A. 512 (Ct. of Ch.1925) was decided, the particular language to be found in the constitutional authorization (supra, p. 22) and the statutory implementation thereof, 9 Del.Ch., Chap. 26, in my opinion, extended the meaning of "police power", as was recognized by subsequent decisions of the Supreme Court of this State, which decisions, in a sense, approved the extension of the meaning of the concept of "police power".
The Supreme Court of the United States has approved such extension of the meaning of "police power" in Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954). The Supreme Court there unanimously sustained the validity of the Redevelopment Act, applicable to the District of Columbia, and, in doing so, said (348 U.S. 33, 75 S.Ct. 102):
"`Public safety, public health, morality, peace and quiet, law and order  these are some of the more conspicuous *27 examples of the traditional application of the police power to municipal affairs. Yet they merely illustrate the scope of the power and do not delimit it. See Noble State Bank v. Haskell, 219 U.S. 104, 111, 31 S.Ct. 186, 188, 55 L.Ed. 112 [116 32 L.R.A.,N.S., 1062, Ann.Cas.1912A, 487]. Miserable and disreputable housing conditions may do more than spread disease and crime and immorality. They may also suffocate the spirit [of] by reducing the people who live there to the status of cattle. They may indeed make living an almost insufferable burden. They may also be an ugly sore, a blight on the community which robs it of charm, which makes it a place from which men turn. The misery of housing may despoil a community as an open sewer may ruin a river.
"`We do not sit to determine whether a particular housing project is or is not desirable. The concept of the public welfare is broad and inclusive. See Day-Brite Lighting, Inc. v. State of Missouri, 342 U.S. 421, 424, 72 S. Ct. 405, 407, 96 L.Ed. 469 [472]. The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled.' * * *."
Subsequently, the Court's opinion considered the concept of "police power", saying (348 U.S. 32, 75 S.Ct. 102):
"* * *. We deal, in other words, with what traditionally has been known as the police power. An attempt to define its reach or trace its outer limits is fruitless, for each case must turn on its own facts. The definition is essentially the product of legislative determination addressed to the purposes of government, purposes neither abstractly nor historically capable of complete definition. Subject to specific constitutional limitations, when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive. In such cases the legislature, not the judiciary, is the main guardian of the public needs to be served by social legislation, whether it be Congress * * *, or the States legislating concerning local affairs. * * *. The role of the judiciary in determining whether that power is being exercised for a public purpose is an extremely narrow one. * * *."
In Day-Brite Lighting, Inc. v. State of Missouri, 342 U.S. 421, 424, 72 S.Ct. 405, 408, 96 L.Ed. 469, Mr. Justice Douglas, speaking for the majority of the Court, said:
"* * *. The public welfare is a broad and inclusive concept. The moral, social, economic, and physical well-being of the community is one part of it; the political well-being, another. The police power which is adequate to fix the financial burden for one is adequate for the other. The judgment of the legislature that time out for voting should cost the employee nothing may be a debatable one. * * *. But if our recent cases mean anything, they leave debatable issues as respects business, economic, and social affairs to legislative decision. * * *."
The language quoted from the Berman and the Day-Brite Lighting case is only an expansion of the language used by Mr. Justice Sutherland in Village of Euclid v. Amber Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926) in upholding the constitutionality of zoning laws on the basis of "police power". In that case Mr. Justice Sutherland said (272 U.S. at p. 387, 47 S.Ct. 118) that constitutional guarantees do not vary but the application of constitutional principles must expand or contract to meet the new and different conditions which are constantly coming into the *28 field of their operation. Such results inevitably must follow if the current mode and standards are to continue and further progress made.
A state case which illustrates the possibilities of expansion of the concept of "police power" is General Outdoor Advertising Co., Inc. v. Department of Public Works, 289 Mass. 149, 193 N.E. 799 (1935), in which municipal legislation pertaining to signs and billboards and restricting and limiting them was upheld.
Referring to the findings in the lower court, Supreme Judicial Court of Massachusetts, said (193 N.E. 808):
"* * *. `Billboards are designed to compel attention. The advertising matter displayed upon them in words, pictures or devices, is conspicuous, obstrusive and ostentatious, being designed to intrude forcefully and persistently upon the observation and attention of all who come within the range of clear normal vision. The only real value of a sign or billboard lies in its proximity to the public thoroughfare within public view. The advertising signs or billboards of the complainants, and others, are always located within public view, and almost invariably along, or adjacent to, boulevards, main avenues, roads and streets, in populated areas, where traffic of all kinds is heaviest. They are also located along the highway in rural or open sections, and along the lines of railroads. In a very few instances, certain of the complainants own the fee in the premises where their signs or billboards are erected. For the most part, however, the complainants erect their signs or billboards on premises under a lease or license for definite terms.' * * *."
The Court after stating the above facts (193 N.E. 815) said:
"`The plaintiffs urge that the rules and regulations, so far as they relate to the preservation of scenic beauty and the exercise of taste and fitness in the location of billboards, are void because they rest upon "aesthetic considerations." It was said in Re Opinion of the Justices, 234 Mass. 597, 604, 127 N.E. 525, 528: "It has been decided quite generally, if not universally, by courts in which the question has been raised, that aesthetic considerations alone or as the main end do not afford sufficient foundation for imposing limitations upon the use of property under the police power." While property owners cannot be compelled in general to give up their rights "for purely aesthetic objects," yet if "the primary and substantive purpose of the legislation is such as justifies the act, considerations of taste and beauty may enter in, as auxiliary" * * *.'"
Later on (193 N.E. 816) the Court said:
"* * *. `Grandeur and beauty of scenery contribute highly important factors to the public welfare of a state. To preserve such landscape from defacement promotes the public welfare and is a public purpose. It has been held permissible at public expense to provide band concerts. Hubbard v. Taunton, 140 Mass. 467, 5 N.E. 157, and to erect monuments, statues, gates, archways and memorial halls, and to engage in public celebrations, Kingman v. [City of] Brockton, 153 Mass. 255, 26 N.E. 998, 11 L.R.A. 123. It was said in Attorney General v. Williams, 174 Mass. 476, 479, 480, 55 N.E. 77, 78, 47 L.R.A. 314, that public parks, although only recently thought to be a public purpose, now "are expected to minister, not only to the grosser senses, but also to the love of the beautiful in nature, in the varied forms which the change in season brings. Their value is enhanced by such touches of art as help to produce pleasing and satisfactory effects on the emotional and spiritual side of our nature. Their influence should be uplifting, and, in the *29 highest sense, educational. If wisely planned and properly cared for, they promote the mental as well as the physical health of the people. For this reason it has always been deemed proper to expend money in the care and adornment of them, to make them beautiful and enjoyable. Their aesthetic effect never has been thought unworthy of careful consideration by those best qualified to appreciate it." * * *. In so far as the granting or denial of permits for the location of billboards in the cases at bar has been governed by considerations of taste and fitness, the purpose has been to preserve places of natural scenic beauty and historical interest from incongruous intrusion. It is in substance exclusion of billboards and advertising devices by zoning. It is an attempt to segregate them to a certain extent to places where from the scenic or historic point of view the dominant use of land is indifferent or is the transaction of business, and to shut them out from regions where nature has afforded landscape of unusual attractiveness and where historic and other factors have created patriotic places hallowed by literary and humanitarian associations. In view of the essential qualities of the plaintiffs' business as earlier described in this opinion, we think an administration of the rules and regulations to the end that the scenic beauty of the commonwealth may be protected and preserved violates no constitutional right of the plaintiffs. * * *.'"
In Liggett's Petition (1927) 291 Pa. 109, 139 A. 619, the Supreme Court of Pennsylvania, in passing upon the validity of the zoning ordinance of Pittsburgh which prohibits the location of commercial advertising and billboards in residential districts, held that it was within the legislative power of a city to prohibit the location of billboards and advertising signs in the residential district in that it promoted general welfare.
There are many cases from the state courts which have upheld regulation of signs and billboards, where the aesthetic point of view was recognized by the courts as interest worthy of protection. See Murphy, Inc. v. Town of Westport, 131 Conn. 292, 40 A.2d 177, 156 A.L.R. 568; Criterion Service v. City of East Cleveland, Ohio App., 88 N.E.2d 300 and Baddour v. City of Long Beach, 279 N.Y. 167, 18 N.E. 2d 18, 124 A.L.R. 1003.
The concurring opinion of Mr. Justice Jacobs of the Supreme Court of New Jersey in Lionshead Lake, Inc. v. Wayne Township, 10 N.J. 165, 89 A.2d 693 at 699, frankly recognized aesthetics as an important element to be considered in zoning legislation:
"* * *. `The provisions with respect to two-story dwellings were influenced in considerable part by aesthetic considerations which I believe to be entirely proper. [citing cases] In the Point Pleasant case I recently expressed the view, to which I adhere fully, "that it is in the public interest that our communities, so far as feasible, should be made pleasant and inviting and that primary considerations of attractiveness and beauty might well be frankly acknowledged as appropriate, under certain circumstances, in the promotion of the general welfare of our people." [Borough of Point Pleasant Beach v. Point Pleasant Pavilion] [3 N.J.Super. 222, 66 A.2d [40] 41] And in the Brookdale case Justice Heher expressed the view that, on principle, regulation on aesthetic grounds would seem to be within the police power [Brookdale Homes, Inc. v. Johnson] [126 N.J.L. 516, 19 A.2d [868] 871] "if so far promotive of the interests of the public at large, through the resultant community development and profit, as to outweigh the incidental restraint upon private ownership." [Citing cases] To the extent that our earlier cases express outmoded narrower doctrines, see Passaic *30 v. Paterson Bill Posting Co., 72 N.J.L. 285, 287, 62 A. 267 (E. & A.1905) they ought be expressly disavowed.'"
See further Zoning for Aesthetic Objectives: A Reappraisal, 20 Law and Contemporary Problems (1955).
The constitutional questions raised (supra, pages 15 and 20) by petitioners as to equal protection of the law and/or discrimination similarly are without merit and substance. Since the Supreme Court's decision in Village of Euclid v. Ambler Realty Co. (supra, page 27) it would now seem beyond doubt that a State Legislature or municipal legislative body has clear power to classify lands for zoning purposes, and that takes such questions as equal protection of the law and/or due process out of these zoning matters. See 272 U.S. at pages 388, 390, 47 S.Ct., pages 118 and 119.
Then too, the Supreme Court of New Hampshire in Rockingham Hotel Company, Inc. v. North Hampton, 101 N.H. 441, 146 A.2d 253 (1958) has decided the precise question raised by the petitioners here, and adversely to their contentions. In the cited case, the Village of North Hampton had adopted a zoning ordinance prohibiting signs and billboards on lands, except such signs and billboards advertising products sold on the premises. The Hotel Corporation sought permission to erect a sign, advertising the hotel, on land remotely located from the hotel. Permission was denied. The New Hampshire Supreme Court said in upholding the refusal of permit and in deciding the constitutional questions (146 A.2d at page 255):
"According to well established principles, the separate classification, as a permitted use, of signs advertising businesses conducted upon the premises where the signs are located, as against a prohibited use of like signs advertising products or services available in other locations, is a reasonable classification which does not as a matter of law produce arbitrary discrimination or deprive the plaintiff of the equal protecof the laws. * * *."
For the reasons stated the decisions of the Zoning Board of Adjustment are sustained and the appeals dismissed. Orders effectuating this decision may be presented on notice.
NOTES
[1] The sign is 61 square feet in area. It will be noted that the photograph shows that Franklin Builders has painted another advertisement of "Northridge" on the side of a building, a short distance to the left of the sign under attack. This advertisement measures 8 x 13, thus giving it a total square feet area of 117 square feet.

Lands classified R-1 may not, under the Zoning Code, be used for any purposes except for residences. Signs advertising sale of such residences may be placed on the lands where the residences are built. These signs are restricted in size, post, page 15.
[2] Since Franklin has referred to 17 Delaware Code, Section 1108, some reference must be made to the effect of Chapter 11 of our Code in which the apposite section appears.

In 1939, twelve years before the enactment by the General Assembly of the law which authorized the Levy Court of New Castle County to adopt zoning regulations, the General Assembly enacted a law, providing for the control of outdoor advertising and signs. 17 Delaware Code, Chapter 11. The General Assembly made it very clear that this law was not intended to interfere with more stringent restrictions imposed by any other governmental body. Section 1102, for instance, provides that the Chapter shall not be in derogation of other powers or authority exercised by a Planning Board or Authority. Section 1110 provides that no Zoning Board or Commission or Agency shall permit outdoor advertising prohibited by "this chapter or by the Department under the provisions of this chapter, nor shall the Department permit any outdoor advertising which is prohibited by any other law or by any board * * * or by any * * * public agency in the lawful exercise of its or [their] powers".
In view of these Sections, it seems clear that Chapter 11 of Title 17 Delaware Code has no effect on the questions raised so as to nullify the prohibition against signs or billboards, which appears in the New Castle County Zoning Code, inasmuch as the above cited chapter does not have the effect of permitting that which is not authorized by the Zoning Code of New Castle County.
[3] There is doubt as to the power of an Administrative Agency, such as a Zoning Board of Adjustment, to determine constitutional questions, 73 C.J.S. Public Administrative Bodies and Procedure § 67 and cases cited, and 101 C.J.S. Zoning § 209; but compare 42 Am.Jur., §§ 219-223; see also Lamothe v. Zoning Bd. of Review, 81 R.I. 96, 98 A.2d 918, 920 and Thompson v. Smith, 119 Vt. 488, 129 A.2d 638, 644, 651.
[4] See f.n. 2, page 16, supra.
[5] The sign measures 8 feet by 16 feet; it has an area of 128 square feet.
[6] Title 9 Del.C. § 2620(a) defines "non conforming uses":

"(a) The lawful use of a building or structure, or the lawful use of any land, as existing and lawful at the time of the enactment of a zoning regulation, or in the case of a change of regulations, then at the time of such change, may, except as hereinafter provided, be continued although such use does not conform with the provisions of such regulations or change, and such use may be extended throughout the same building, provided no structural alteration of such building is proposed or made for the purpose of such extension. The Levy Court in any zoning regulations may permit the restoration, reconstruction, extension or substitution of nonconforming uses upon such terms and conditions as may be set forth in the zoning regulations."
Title 9 Del.C. § 2621 directs the Zoning Commission to prepare and publish (after the adoption of zoning regulations or changes) "a complete list of all nonconforming uses * * * existing at the time of the adoption of the regulations or changes". The section prescribes what the list shall show and requires the list to "be filed for record in the offices of the Zoning Commission and of the Board of Adjustment".
It would seem, therefore, the contentions of Alan's counsel as to the meaning to be given "non-conforming uses" are without merit in light of these sections of the statute and they are disregarded as being without substance.
[6a] The Board was without power to grant any such permit. See In the Matter of the Petition of Shell Oil Company, cited at page 26, post.
[7] Where emphasis is supplied such will be noted; where the emphasis is found in the Law or Zoning Code no reference will be made  it being understood such emphasis is to be found in the Law or Zoning Code.
[8] Church or place of worship; parish house or Sunday School building.
[9] Public school, parochial school, library, museum or art gallery, fire station.
[10] Trailer parks.
[11] Hospital, sanitarium or nursing home not for the care of patients with contagious disease.
[12] Club house or fraternal lodge.